The **KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant,**

v.

**Carlton E. JUSTIS, Appellee.**

**No. 15679.**

United States Court of Appeals Fifth Circuit.

April 6, 1956.

Rehearing Denied May 2, 1956.

Vernon Woods and James J. Butler, Shreveport, La., Wilkinson, Lewis & Wilkinson, Shreveport, La., of counsel, for appellant.

Leonard L. Lockard, Shreveport, La., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

This action under the Federal Employers' Liability Act[1] was brought by the appellee, a freight train conductor, as plaintiff, against the appellant railroad, as defendant. Plaintiff and brakeman Young were in the caboose at the rear of the train when it was brought to a stop for a scheduled inspection at Shoreline, Louisiana. According to their testimony, the train stopped with an unusual jerk or jolt, so extraordinary that the left side of plaintiff's neck hit against an iron safety pole a few inches away and he then hit the floor, and Young was propelled down the aisle in a run for 15 to 18 feet, and then gripped a seat which broke the force of his forward movement.[2]

Although aware of the regular stop, the plaintiff and Young were building a fire in the stove in the caboose. The plaintiff had taken a packing iron, an iron rod about 18 inches long used to pack the journal boxes on the train, and was poking at the ashes in the stove. He was standing slightly bent over in a narrow and confined place with little or no space in which to move his feet.

Following the accident, plaintiff was examined by several physicians and X-rays were taken. For some unexplained reason no fracture was detected, although it was established at the trial that even a layman should have observed that the spinous process of the seventh cervical vertebra, a bone that projects from the spine like the fin of a fish, about

---

1. 45 U.S.C.A. § 51.

2. In addition, the plaintiff, testified that in twenty-six years of railroading, he had experienced only one other stop as rough as this one, and Brakeman Young referred to it as a "terrific stop". There was testimony that the usual and ordinary stop will not upset a trainman walking on the catwalk on top of the train.

one inch long and one-half inch wide, was broken midway and the fragment wholly detached. Believing the pain to be the result of arthritis, attending physicians caused the plaintiff to return to work about two months after the accident. The pain from the unhealed fracture was so severe that he continued to work only with the aid of sedatives and pain killing medicines, but did work for approximately one year, at which time his condition was diagnosed as pulmonary tuberculosis and he was hospitalized.

The defendant contended that it was not negligent in the stopping of the train at Shoreline, and that the plaintiff's injury resulted solely from his own negligence.

The defendant's motion for a directed verdict was denied. The jury returned a verdict for the plaintiff in the amount of $45,000.00. Thereafter the defendant's motions for judgment notwithstanding the verdict and alternatively for a new trial were denied.

Appellant's specifications of error are as follows:

"1. It was error to submit the case to the jury there being no proof that defendant was negligent.

"2. The jury's verdict is so against the overwhelming weight of the evidence as to be arbitrary, capricious and in utter disregard of the Court's instructions in that:

"(a) The evidence that Plaintiff's tuberculosis was caused to flare up by traumatic tearing of lung tissue was conjectural and insufficient to support the jury's conclusion.

"(b) The jury held the Defendant liable for the errors of the attending physicians.

"3. The refusal of the Trial Court to grant Defendant's Motion for a New Trial on the ground that the verdict was excessive, when weighed against Plaintiff's contributory negligence and the cause of the flare up of his tuberculosis, was an abuse of discretion."

I. The plaintiff attempted to prove negligence arising from confusion of the members of the forward crew about the kind of inspection to be given the train at Shoreline. Three days before this accident, the inspection at Shoreline was changed from a "running inspection" to a "ground inspection." Prior to that time, the inspection was achieved by the train simply slowing down, dropping a brakeman off the engine, drawing the train by him slowly and allowing him to catch on to the caboose, a casual kind of inspection, and to only one side of the train. A more thorough type of inspection was inaugurated by a bulletin directing that the inspection "be accomplished by brakeman walking from the head end until he meets brakeman walking from the rear end, after which they will cross over, walk back, and inspect the opposite side of the train." While this change suggests a possibility, we find no specific evidence that any confusion caused thereby resulted in the sudden stop.

▮ There was ample evidence, as heretofore indicated, from which the jury could have found that the train stopped with such a sudden, extraordinary and violent jerk or jolt as ordinarily does not occur in the absence of someone's negligence. See Raze v. St. Louis Southwestern Ry. Co., 360 Mo. 222, 227 S.W.2d 687, 688. According to the evidence, the sudden stop could have resulted from any one or more of three possible causes: (1) improper handling on the front end, such as improper application of the brakes by the engineer; (2) defective brakes or faulty brake line; (3) a maldistribution of the train load.

The engineer testified to a proper application of the brakes and he and the other members of the forward crew testified that there was no mishandling of the train at that end. The brakes and brake line had been inspected shortly before the accident and were inspected after the stop at Shoreline, and no defects or deficiencies were found. The wheel report showed that the train con-

sisted of 15 empty cars and 48 loaded cars pulled by four diesel units. The caboose, as customary, was on the rear end and there were 16 loaded cars immediately adjacent thereto. The evidence as to how the load should properly be distributed was in conflict. Mr. Anderson, an experienced freight train conductor introduced by the defendant, testified that when loads are bunched on the end of a train the likelihood of a violent jar in the caboose upon the stopping of a train is increased because "the rear end being loaded heavier it might run into the head end of the train"; while Mr. Young, who was in the caboose with the plaintiff and was an experienced brakeman, testified that, "Well, empties running into the load will make more jar. If you have the empties toward the rear end of the train they will run into the loads and that will make more jar on the rear end of the train."

The plaintiff conductor did not make up the train; it was made up by other employees of the defendant. There was testimony, however, that the switch list showing the location of empties and loads is ordinarily given to the conductor by the yardmaster, and that this information is not given to the engineer unless the conductor himself does so, which he had not done in this instance.

■ We think that the learned district court properly submitted the issue of negligence to the jury under the doctrine of "res ipsa loquitur" [3] as that doctrine is applied in actions arising under the Federal Employers' Liability Act and other federal laws.[4] The in-

---

**3.** The full charge of the district court on res ipsa loquitur, *to which the defendant reserved no exception* was as follows:

"In addition to his specific charges of negligence against defendant, plaintiff is relying here upon the doctrine of res ipsa loquitur, which is a Latin term meaning that the thing or affair speaks for itself. Res ipsa loquitur means that the facts of the occurrence may warrant the inference of negligence; not that they compel such an inference; that they furnish evidence of negligence where direct evidence of it may be lacking; but it is evidence to be weighed, not necessarily to be accepted as sufficient, which may call for explanation or rebuttal; not necessarily that they require it. When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the accident is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of explanation, that the injury arose from the defendant's want of care. If in this connection you determine that plaintiff sustained injury through an unusual and unexpected jolt or jar of the train, without any fault on his part, then you may find for plaintiff; unless defendant has shown to your satisfaction that such an extraordinary jolt or jar was not due to its negligence. In order to apply this doctrine here, you first must determine from a preponderance of the evidence, that there was, first, an unusual

jolt or jar, and, secondly, that the train was under the exclusive control of defendant's employees other than Mr. Justis. If you do not find that both of these factors have been shown to your satisfaction by a preponderance of the evidence, then you will ignore what we have said regarding the doctrine of res ipsa loquitur. Likewise, in order to apply it, you must determine that plaintiff is not in a position to explain the cause of the accident at least equally as well as are defendant's other employees. If you do decide from a preponderance of the evidence that the doctrine is applicable, then, unless the defendant has shown to your satisfaction that the jolt or jar was caused by force beyond its control, you may decide the case for the plaintiff.

"It is only where the circumstances leave no room for a different presumption that the doctrine applies, and it is not applicable in any case, unless by a process of proper reasoning the facts and circumstances point out the wrongdoer, the wrongful character of his act, and exclude every other probable cause of the injury. The doctrine is not proof and does not support a want of proof. It is a rule of interpretation by which evidence of facts is made to speak the logical conclusions naturally flowing therefrom."

**4.** Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 57 L.Ed. 815; Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 457, 67 S.Ct. 401, 91 L.Ed. 416; Johnson v. United States, 333 U.S. 46, 49,

stant case is, we think, a stronger one for the application of the so-called res ipsa loquitur doctrine than was the Jesionowski case, supra. There the claimed negligence of the deceased brakeman might have been the sole cause of the derailment, with no other negligence on the part of the railroad. Here, the most that could be claimed against the plaintiff is his failure to act after being informed of an improper distribution of the load primarily brought about by other employees. The plaintiff had no connection with maintenance of the brakes or brake line, or with the handling of the brakes in making the stop. He was entitled to recover if his injury resulted *"in whole or in part* from the negligence of any of the * * * employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its * * * equipment." 45 U.S.C.A. § 51. In the present case, once the jury found a sudden stopping and an unusual jolt or jar from which they inferred negligence, such negligence could not be chargeable solely to the plaintiff. If negligent at all, his negligence was contributory, not barring a recovery but calling for a diminution of damages. 45 U.S.C.A. § 53.

The discussion thus far does not take into account the claimed negligence of the plaintiff in the position in which he was standing and in failing to hold onto the safety pole rather than the packing iron with which he was shaking the ashes out of the grate. The plaintiff testified that he was braced by the packing iron and prepared for any ordinary stop. The other railroad employees testified that they continued in the performance of such duties as they were about when a train was coming to a known stop. It cannot be held, as a matter of law, that this claimed negligence on the part of the plaintiff was the sole cause of his injury. The issue was for the jury.

II. The verdict was general, and there is no way to differentiate between the damages admittedly arising out of this accident and the plaintiff's claim for reactivation of tuberculosis. That disease was found moderately advanced five months after the accident. The physician who had treated the plaintiff for tuberculosis testified that latent tuberculosis can be reactivated by shock and trauma on the exterior of the body and that, "I do think the accident probably caused it." A physician introduced by the defendant testified to a contrary opinion. Both physicians agreed that plaintiff's severe and unexplained pain from the undetected fracture with the consequent fatigue, worry, and anxiety were prime factors in aggravating tuberculosis. Defendant argues that these consequences resulted solely from the negligence of the attending physicians in failing to detect the fracture of the vertebra.

According to appellant's brief, acquiesced in by appellee, that issue was submitted to the jury by an instruction [5] which we do not find in the record.

---

68 S.Ct. 391, 92 L.Ed. 468; Wilkerson v. McCarthy, 336 U.S. 53, 62, 69 S.Ct. 413, 93 L.Ed. 497; Cf. Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 196 F.2d 199, 205; Whalen v. Phoenix Indemnity Co., 5 Cir., 220 F.2d 78, 82, note 4; Giacalone v. Raytheon Mfg. Co., 1 Cir., 222 F.2d 249, 252; See also the discussion in Texas & Pacific Ry. Co. v. Buckles, 5 Cir., 232 F.2d 257.

5. "If you find it is shown by the evidence that the railroad selected the doctors, and if those doctors were guilty of malpractice or exercised medical skill less than what is to be reasonably expected, and that caused damages to the plaintiff, the railroad company in this case would not be liable for such malpractice or lack of ordinary skill. This is so for the reason that the doctor would occupy the status of an independent contractor, and was not an officer, agent or employee of the railroad.

"However, you are further charged that when one inflicts negligent injury on another, he is liable for all the natural, probable and reasonably foreseeable consequences of his act.

"Even at the hands of a skilled physician or surgeon, patients sometimes receive less than the best medical treat-

If so, the instruction was too favorable to the defendant, for the law is well settled that:

"If the negligent actor is liable for another's injury, he is also liable for any additional bodily harm resulting from acts done by third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner." Restatement, Torts, § 457, p. 1214.

There was no suggestion that the plaintiff did not exercise due diligence in the selecting of a doctor, and that is all that is required of an injured person.[6] In any event, even under the instruction too favorable to the defendant, the jury was clearly authorized to find the issue against it in reliance on the testimony of the treating physician.

III. It was stipulated that plaintiff's life expectancy was 19.2 years and his work expectancy 9.32 years. He was earning net after taxes $5,700.00 per year. He is permanently disabled from railroading, the only occupation he had known. His fractured vertebra has not yet been corrected, although he had been confined to his bed for almost a year and had suffered considerably. The affected area in both lungs is considerable. There was evidence from which the jury could have failed to find the plaintiff guilty of negligence, or negligent to a degree not requiring a further diminution of damages. The action of the trial court in denying the motion for new trial is "not without support in the record". Neese v. Southern Ry. Co., 350 U.S. 77, 76 S.Ct. 131, 132; Cf. Whiteman v. Pitrie, 5 Cir., 220 F.2d 914.

The judgment is accordingly

Affirmed.

CAMERON, Circuit Judge (dissenting).

For the reasons set forth in my dissenting opinion in Texas & Pacific Railway Co. v. Buckles, 5 Cir., 232 F.2d 257. I think it was error for the Court below to consider or apply the doctrine *res ipsa loquitur*. I developed in that opinion the general rule that this doctrine was a rule of necessity only, and was applicable only when necessary evidence is absent and not readily available. Here, as there, I think that the facts were fully developed in the evidence.

Plaintiff Justis showed exactly what he was doing, and the brakeman who was in the caboose with him supplemented that testimony. All of the members of the train crew showed exactly what they were doing. The condition of the brakes was disclosed in the evidence, and the brakes had worked properly on all of the equipment. The condition of the roadbed, the terrain, and all of the equipment was shown by the testimony.

The engineer was the only man who performed any duties in bringing the train to a stop and he used the automatic braking system on all of the cars to reduce the speed from about fifty miles to about twenty miles an hour, and thereupon slacked off on the automatic brake and applied the independent engine brake gradually until the train came to a complete stop. It was proved by him and by a number of outside experts that what he did was the proper thing to do.

Plaintiff developed, by his examination of the witnesses, the theory that sufficient notice was not given to the train crew about a change of method which took place a few days before this accident and which related to the char-

---

ment. This may be a reasonably foreseeable circumstance, the knowledge of which may be chargeable to the one guilty of negligence, causing the original injury."

6. Texas & Pacific Ry. Co. v. Hill, 237 U.S. 208, 214, 35 S.Ct. 575, 59 L.Ed. 918;

Stephenson v. Steinhauer, 8 Cir., 188 F.2d 432, 439; Jensen v. United States, 3 Cir., 184 F.2d 72, 75; Lucas v. City of Juneau, D.C.Alaska, 127 F.Supp. 730, 731, 732; 25 C.J.S., Damages, § 20, pp. 477, 478; 15 Am.Jur., Damages, § 85; Annotations 126 A.L.R. 912, 39 A.L.R. 1268, 8 A.L.R. 506.

acter and details of the inspection which occasioned the stopping of the train. Apparently plaintiff tried to develop the idea that maybe the members of this train crew had not been advised of the change of practice so that they could perform their duties as members of the team which was the crew of the train.

Considerable evidence was introduced concerning the placement of loads and empties in a train of this character, and the plaintiff had certain responsibilities in connection therewith. Without dispute, he knew how the loads were distributed in the train, and he knew further that the train was in the act of coming to a stop, and he stated that the speed had been reduced from about fifty miles an hour to about five miles per hour at the time of the jerk which caused his trouble. It was uncontradicted that, if he had taken a seat or had caught hold of the safety rod within his reach, his injuries would not have occurred. He did not take that precaution because he assumed that the stop would be a gentle and easy one and not a violent one.

All of the testimony of all of the witnesses was clear and understandable, and the Court and jury knew from it what happened. Every aspect of the operation was placed before the Court and jury, and there were no gaps or obscure places in the testimony. Neither the Court below nor the jury should have placed upon the railroad company the burden accompanying the application of res ipsa loquitur. It had no place in the case because evidence had been introduced about every phase of it, including the actions and the failure to act on the part of the plaintiff. The Court below and the jury ought to have reached their respective decisions on the facts and not on any presumption of negligence.

There was satisfactory proof that a hard jerk does not occur in the day to day handling of freight trains. While conceding that it was his duty to be prepared constantly for sudden starts or stops and for setting of the brakes

and for slack action, plaintiff classified the stop which occasioned his injury as an "awful rough stop". That is a vague and uncertain term and does not put any definite appraisal on the character of the stop. What one man would consider an "awful" rough stop, another, especially an experienced railroad man, would consider a normal stop. Plaintiff established that each draw-bar of the freight cars had a play in it of four inches, making a total of eight inches between each two cars. That would make more than forty feet of play or slack between the engine and the caboose. Without dispute, it is necessary to handle that slack in bringing a train to a stop by slowing down and finally stopping the motion of the heavy engine and letting the cars proceed forward under their own momentum until all of the slack is taken up. It is common knowledge that every time that is done or the opposite is done when a freight train begins a movement, a jerk of varying proportions takes place. While some short passenger trains do have rigid couplings, freight cars universally and necessarily have this play in their couplings and operation could not continue without this play. Every man who railroads knows that and is bound to accommodate his own actions to that known fact.

The doctrine res ipsa loquitur would be applicable only if it was necessary to furnish evidence which was not readily available, if the accident was of a kind which ordinarily does not occur in the absence of someone's negligence, and if it was not due to any voluntary action or contribution on the part of the plaintiff. The evidence in this case did not, in my opinion, satisfy those conditions.

It is manifest that the Court below did apply it, both in charging the jury and in reaching its own conclusions with respect to the various motions challenging the sufficiency of the proof. Among these were the motion at the conclusion of all of the evidence for a directed verdict, and the motion for

**274**

new trial. In every instance the attention of the Court was called specifically to defendant's reliance upon its contention that the doctrine should not be applied.

The cases are legion and are on every side of the problem under consideration. I have found none directly in point or which are determinative of the problem. The law cited in my dissent in Texas & Pacific Railway Co. v. Buckles, supra, applies here and nothing would be gained by citing other cases. In my opinion, the actions and judgment of the Court below were produced in part by applying *res ipsa loquitur*, and this was error for which its judgment should be reversed.

Rehearing denied: CAMERON, Circuit Judge, dissenting.