**PANHANDLE & SANTA FE RY. CO. v. RAY.**

**RAY.**

**No. 9798.**

Court of Civil Appeals of Texas. Austin.

June 15, 1949.

Rehearing Denied July 6, 1949.

**938**

Wigley, McLeod, Mills & Shirley, of Galveston, Scott Snodgrass, of San Angelo, for appellant.

John J. Watts, of Odessa, Charles Gibbs, of San Angelo; J. W. Stovall, of San Angelo, for appellee.

ARCHER, Chief Justice.

This suit results from a railroad crossing accident which occurred at San Angelo, Texas, on November 1, 1947. The plaintiff and his wife were traveling southwesterly in an automobile driven by the plaintiff and the switch engine involved was traveling northeasterly. The angle made by the paths of the two vehicles as they approached the point of collision was one of approximately 135 degrees.

Various grounds of negligence and contributory negligence were pleaded and various grounds of each were submitted.

The jury found in favor of the plaintiff and fixed his damages at $101,500, with $25,000 of the amount being awarded for injuries suffered by his wife and the remainder being awarded for injuries suffered by him.

Judgment having been rendered for the amount found by the jury the defendant's motion for new trial was overruled upon condition that the plaintiff remit $25,000 of the recovery. The remittitur was made and final judgment was entered for the sum of $76,500.

Appellant assigns as error 19 points, and they are in seven general classifications: (1) the failure of the evidence to show negligence which proximately caused the collision; (2) the failure of the court to submit to the jury the issues which were pleaded by the parties; (3) the prejudicial argument of the plaintiff's attorney who closed the case; (4) the misconduct of the jury in receiving additional evidence during its deliberation; (5) error in selection of the jury; (6) the admission of improper evidence; and (7) the excessiveness of the recovery.

By its first point appellant alleges error by the trial court in refusing to render judgment in its favor based on its motion for instructed verdict, and also on its motion for verdict notwithstanding the verdict of the jury; both motions were denied. In support of its position the appellant alleges that there was not sufficient evidence to show that negligence pleaded and proved was a proximate cause of the collision.

The court defined "extra hazardous crossing" as follows: "By the term 'extra hazardous crossing' is meant a particular crossing which is shown to be more than ordinarily dangerous one attended with unusual or extra hazards,—a crossing so peculiarly dangerous that prudent persons can not use the same with safety unless extraordinary means are used to protect such crossing."

The first issue submitted was to inquire if the conditions surrounding the crossing were such as to render it more than ordinarily dangerous as a nighttime crossing; and the jury answered in the affirmative.

Special issue No. 2, conditioned on an affirmative answer to special issue No. 1, made further inquiry, "If an ordinarily prudent person, in the exercise of ordinary care, due to the conditions, if any, surrounding such crossing, would have had a flagman at the crossing"; and this issue, too, was answered in the affirmative.

Special issue No. 3, conditioned on an affirmative answer to special issue No. 2, made inquiry if the failure to have a flagman at the crossing to warn plaintiff of its approaching engine was a proximate cause of the collision and the injuries to plaintiff and his wife; and this issue was answered, "Yes."

The fourth special issue inquired if an ordinarily prudent person, in the exercise of ordinary care, due to the conditions, if any, surrounding such crossing, would have had a signal light at said crossing to warn plaintiff of its approaching engine. This issue was answered, "Yes."

Special issue No. 5, conditioned on an affirmative answer to special issue No. 4, inquired if the failure to have a signal light, etc., was a proximate cause of the collision, and the injuries, if any, received by plaintiff and his wife; and this issue was answered, "Yes."

As is apparent, all of these issues are based on the question of whether the cross-

ing was an extraordinarily hazardous one, and questions as to negligence and proximate cause based upon failure to provide special warnings.

The court defined "extra hazardous crossing" as above set out.

Defendant directed objections to the sufficiency of this definition, which were by the court overruled.

■ We believe this definition was sufficient. Missouri, K. & T. Ry. Co. v. Long, Tex.Com.App., 299 S.W. 854, 855. In this cited case we have the statement: "Thus it will be seen that our Supreme Court, in approving the holding of the New Jersey Court, has in effect defined an extraordinary place of danger as a place so peculiarly dangerous that prudent persons cannot use the same with safety, unless extraordinary means are used to protect such place."

By appellant's first point the entire question as to the sufficiency of the evidence under the pleadings to go to the jury, and particularly as to the first issue as to whether the crossing was more than ordinarily dangerous as a nighttime crossing, was raised. Issues 2 and 3 submitted the question of the necessity of a flagman at the crossing; and issues Nos. 4 and 5 submitted the issue as to the necessity of a signal light at the crossing.

Plaintiff pleaded that:

"Plaintiff alleges that the defendant was guilty of negligence because the defendant failed to place a flagman at said crossing when the defendant knew, or in the exercise of reasonable care and prudence should have known, that the crossing in question was extraordinarily hazardous and dangerous crossing and that prudent persons could not use same with safety. In this connection, plaintiff alleges that the track in question leads from the station and switch yards to the south of the crossing and onto the other switch yards to the north; that the passenger and freight trains and switch engines cross said crossing at intervals of about 20 to 30 minutes; that the switch track and trains of the defendant are obstructed from the view of automobile travelers on Culwell Street from the direction in which the plaintiff was proceeding on the night in question;

that is, from the east to the west, in that immediately to the left or south of a traveler in the direction stated buildings are situated close to the street and near the railroad track; that immediately after passing the tracks to the east and from the direction in which plaintiff was traveling, the road makes a dip and the view of the track and trains is further obstructed by such dip and growth of trees and other brush to the left or east of the road of such height as to further obstruct the view of the track; and plaintiff further alleges that the track at the crossing in question does not cross the street at a 90° angle but more at a possible 45° angle with the track running in a possible northwest and southeasterly direction. Plaintiff will further show that beginning on the east side of the track and toward the east, the road begins to dip, and continues to dip until a car is completely hidden from view to anyone west of the track; that the buildings heretofore mentioned are very close to the track and the obstructions heretofore alleged, the curve and dip of the road and the further fact that many trains pass over the track and the further fact that the only sign of any kind placed at the crossing by the railroad company is a cross sign on the southwest side of the track and that said sign is unlighted and there is nothing on it to attract the attention of travelers at night; that it sits only a few feet from the paved portion of the road and only a few feet from the railroad track itself; that under all the circumstances the crossing is an extraordinarily hazardous and dangerous crossing, especially at night when this accident occurred; that the traffic on the road is extremely heavy and the defendant knew such fact about the road in question; that a traveler at night is practically upon the track before he knows of its presence; and plaintiff further alleges that many accidents have occurred at said crossing to further call to the attention and to apprise the defendant that the crossing is extraordinarily dangerous and hazardous and that a flagman should have been placed at said crossing at the time of and prior to the accident herein alleged and which occurred to plaintiffs, and plaintiff alleges that had

a flagman been placed at said crossing on said occasion the accident and the serious injuries received by the plaintiff and his wife would not have occurred, and hence plaintiff alleges that the defendant corporation is guilty of negligence in failing to have a flagman at said crossing to warn the plaintiff and his wife and other motorists of their danger on said occasion, which said negligence was and is the proximate cause of all the damages sustained by the plaintiff and his wife.

"(b) Plaintiff further alleges that the defendant was guilty of negligence in failing to place a signal light at said crossing to warn the plaintiff and other motorists using the crossing heretofore described since the crossing constituted an extraordinarily hazardous and dangerous crossing as heretofore alleged in Paragraph 3(a) and that such negligence on the part of the defendant was the proximate cause of the accident."

All of the evidence, except the pictures (Exhibits D-1, 2, 3 and 4) of the crossing and area offered by appellant and the evidence given by the photographer Bean, was offered by appellee.

Bean testified that he shot the pictures with a hand camera, and was using a peep sight, about even with his mouth, and was trying to make a commercial print. That the track goes diagonal and he was back about 40 steps, and was between the house and the track, and that the angle was down the track. This was Exhibit D-3. The four pictures offered by appellant were of the immediate crossing area.

The pictures offered by appellee were taken' from the east toward the west,— some directly across the crossing, others showing a greater length of the track northward. Appellee's Exhibit P-2 is from the west eastward. These pictures depict the highway and the railroad crossing. It is apparent that the road as it approaches the intersection is at an angle, and the view of the railroad crossing is obscured by the trees at a distance of 250' east of the crossing (Exhibit P-1); and the highway is slightly upgrade, and the view of the crossing is further interfered with by the Drive-in and then by the dwelling 108' from the railroad track. Exhibit P-3 shows the location of this dwelling. Exhibit P-4 is another view of the crossing and the curve of the highway.

We believe that the pleadings properly raised the issues, and conclude that the facts and circumstances of this case were sufficient to carry the issues to the jury. The jury, as triers of the facts, having heard the witnesses and seen the photographs, and having considered all of the facts and circumstances concerning the crossing and the danger incident thereto, was justified in answering special issue No. 1 as it did.

The jury was justified in answering issues Nos. 2, 3, 4 and 5 as it did and is reasonably supported by the evidence. 35 Tex.Jur., Railroads, Sec. 321, with authorities cited.

Tisdale v. Panhandle & S. F. Ry. Co., Tex.Com.App., 228 S.W. 133, 135, 16 A.L.R. 1264, Sup.Ct., Opinion by Powell, J., adopted by Judge Phillips, cited opinion by Judge Brown, Missouri K. & T. Ry. Co. v. Magee, 92 Tex. 616, 50 S.W. 1013, and numerous other authorities. The opinion quotes from Judge Brown's opinion as follows: " 'The court charged the jury, in effect, that if a person of ordinary prudence would, under all the circumstances, have kept a flagman or watchman at the crossing where the plaintiff was injured, then the failure on the part of the railroad company to keep such flagman or watchman was negligence.' "

Galveston, H. & S. A. Ry. Co. v. Wells, 121 Tex. 310, 50 S.W.2d 247, 251, Sup. Ct. by Pierson, J., where it is said in paragraphs 9 and 10: "Both the state and federal decisions support the rule that railway companies should maintain a flagman in towns and cities at crossings which are unusually dangerous or attended with more than ordinary hazard, although there is no city ordinance or statute requiring it. Evidence showing that special circumstances exist in a case which make the crossing unusually hazardous is held sufficient to justify submission to a jury of the issue of the railroad's negligence at the time of the accident."

See also the following cases: Missouri K. & T. Ry. Co. v. Long, supra; and Beaumont S. L. & W. Ry. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232.

■ By its seventh assignment the appellant complains of the submission of special issues Nos. 10 and 11, which made inquiry concerning the failure of the defendant's employees to keep a proper lookout, and if so, was it a proximate cause of the collision. The plaintiff alleged that "its fireman and engineer" failed to keep a proper lookout. We believe that the court was in error in not limiting the inquiry to the employees named in the pleading. Connecticut Gen. Life Ins. Co. v. Smith, Tex.Civ.App., 94 S.W.2d 514.

And since we have disposed of the seventh point as we have, renders unnecessary further discussion of the eighth point.

■ The ninth point challenges the submission of special issues Nos. 12 and 13, concerning the failure to continuously ring the bell on said engine, beginning at least 1,320 feet south of the crossing; and if so, was it a proximate cause of the collision. We believe that it was error to submit the issues as they were submitted, as there was no proof as to how far the engine moved. Texas & N. O. R. Co. v. Brannen et al., 140 Tex. 52, 166 S.W.2d 112.

Since we have held that issues Nos. 12 and 13 were improperly submitted, the judgment cannot be supported on the answer to these issues, and the tenth point is sustained.

■ By the eleventh point appellant complains that the court failed to submit proper issues as to whether plaintiff failed to look to the south, and if so was it the sole proximate cause of the collision; more particularly, the submission of the issue of sole proximate cause conditioned on an affirmative answer to the issue.

We believe the issues were properly submitted and that the sole proximate cause arises where it is claimed that the act of some third party was a proximate cause.

■ From International & Great Northern Ry. Co. v. Acker, Tex.Civ.App., 128 S.W.2d 506, 521, we adopt:

"As another answer to this proposition we think the appellees' first counter proposition to the appellants' tenth is sound. It is stated thus: 'The issue of sole proximate cause of an injury as distinguished from a proximate cause simply does not arise when the suit is between the injured party or those in privity with him and the person inflicting the injury, but such an issue can only arise where it is claimed that the act of a third party was a proximate cause.'

"It seems to us that such issue of sole proximate cause presupposes that the injury is attributable to a third party, unavoidable accident or extraneous happening, etc., and if the injury was attributable to such third party, or he was the sole proximate cause thereof, it would be immaterial whether the act as to the third party was negligence upon his part or not. Holland v. DeLeon, Tex.Civ.App., 118 S.W.2d 489; Parker v. Jakovich, Tex.Civ.App., 115 S. W.2d 790; Wichita Valley R. Co. v. Minor, Tex.Civ.App., 100 S.W.2d 1071; Thweatt v. Ocean Acc. Corp., Tex.Civ.App., 62 S.W.2d 250.

"Here no act of a third party is involved and the jury found there was no unavoidable accident and aquitted the deceased of all negligence and convicted defendants of various acts of negligence, as well as on the issue of discovered peril."

The twelfth point alleges error by the court in not submitting appellant's requested issues A. B. and C. for findings as to whether Ray failed to determine if the crossing would be clear before driving on it, and if so, was Ray negligent; and if such negligence was a proximate cause of the accident.

■ We believe that these issues were raised by the pleading and should have been given; but for the issues 14 to 21, which were defensive issues, and the jury found that Ray kept a proper lookout and that he did not fail to look to the south to determine if anything was approaching on the track; and the jury further found that plaintiff did not drive onto the crossing in front of the engine without looking to see if an engine or train was approaching; therefore there was no error in not giving

these issues. See authorities under the eleventh point, above.

Appellant's thirteenth point is overruled. This requested issue G was for a finding as to whether Ray realized he was in danger in time to have stopped his car before he got to the track. No negligence is alleged or proximate cause is made in connection with this requested issue.

The plaintiff testified that he looked to the south and did not see an intersection, and that he looked to his left and did not see the engine.

By its fourteenth point error by the court in refusing to set aside the verdict because of the argument of counsel who closed the case for the plaintiff, is asserted.

Portions of the argument are:

"Oh, he says when Judge Stovall called that the 'dead man's crossing' that we are appealing to your prejudice. You know, gentlemen of the jury, where no denial is made that Mrs. Pipkin's testimony is true when she said she herself of her own knowledge knew of six accidents at that crossing, I wonder if that crossing has earned a reputation as a dead man's crossing? I wonder if it does not make any red-blooded citizen mad and prejudiced to know that that railroad would be calloused enough, would be indifferent enough to the rights of human beings, to maintain a crossing where a car going thirty miles an hour would have less than 2 1/2 seconds to dodge a train going down that track. * * *

"But why do you think they have railroad crossing signs, generally speaking, throughout America on both sides of the road? Do you think people have learned somebody ought to be advised that there is a railroad crossing and that death might be waiting around the corner? But in this case the good old Sante Fe, God bless them, doesn't think enough of their responsibility to the citizens of this community to even place that one sign there that's not even there today. It might cost them $5.00. Human rights! Are they worth anything in Tom Green County. * * *

"I think I am looking at a bunch of men who believe in the American way of life and who believe that human suffering and the right to live, the right to be free from pain, the right to have God's body unimpaired, is worth a lot. So, I think gentlemen, under the evidence in this case that you should answer the first thirteen issues inquired about, whether the defendant was guilty of causing this, 'Yes'; all of the remaining issues beginning with Issue 14 we say under the evidence should be answered 'No'. Gentlemen of the jury, the Special Issue Law in this state is quite a thing. You know, the Legislature has got it where—you will notice we had to put a lot of 'if anys' in here. Whoever made us have these special issues got them all so complicated and mixed up and tried to confuse them where a jury can't tell anything about the effect it is going to have on their verdict. In other words, every answer—and please remember this—every answer to every issue in this case is important and it's got to be right, because it determines who's going to win and who's going to lose this lawsuit, and I again say under the evidence the first thirteen issues should be answered 'Yes' and the last and remaining issues after the thirteenth issue 'No,' a thousand times 'No.' * * *

" * * * when they need medical attention, when they live in this expensive era of life, when they need shelter from the rain, and all of the rest of the years of their lives; where are they going to get it? Isn't it a just law; isn't it a law that protects you and me, our wives and family and the human race that says a railroad musn't maintain a death trap. The measure of damages is something you swore you would follow; it is a matter of cold mathematical calculation. When you go home to your wives and children, I want you to go home and say, 'I was an American Juror; I was a seeker after the truth; I followed the charge of the court; I gave them what I thought they were entitled to for pain and suffering; like the court told me I could; I gave them, like the court said I could if I thought it was right, what they have really lost, because they can't earn any more money; I have parceled out justice; I.

have given those people the kind of a trial that keeps this America, the kind of a trial by jury that the boys who died on Guadalcanal died to preserve."

We believe that the argument as a whole and in particular the portions copied herein were so prejudicial and inflammatory as to be improper and to require a reversal of this case.

It is noted that: "Whoever made us have these special issues got them all so complicated and mixed up and tried to confuse them where a jury can't tell anything about the effect it is going to have on their verdict. In other words, every answer—and please remember this— every answer to every issue in this case is important and it's got to be right, because it determines who's going to win and who's going to lose this lawsuit, and I again say under the evidence the first thirteen issues should be answered 'Yes' and the last and remaining issues after the thirteenth issue 'No,' a thousand times 'No' "; and further we do not believe that an instruction from the court would have cured the objectionable features.

"In determining whether the argument above quoted was reversibly erroneous, we are guided by the following declaration from Justice Sharp: 'It is not the policy of the law to impose the burden of showing harmless error upon the person whose rights have been transgressed. That burden rests upon the person in whose favor the transgression was made. The rule has been announced, and is adhered to by this court, that, when improper argument has been made, the adverse complaining party is entitled to a reversal of the judgment, as a matter of law, if, under all the circumstances there is any reasonable doubt of its harmful effect, or unless it affirmatively appears no prejudice resulted.' Chapin v. Putnam Supply Co. et al., 124 Tex. 247, 76 S.W.2d 469, 470, citing Texas Indemnity Ins. Co. v. McCurry, Tex.Com. App., 41 S.W.2d 215, 78 A.L.R. 760.

\* \* \* \* \* \*

"It appears from the briefs that no objection was directed to the argument when it was made, but the matter was raised for the first time in defendants' first amended motion for a new trial. It has been frequently held that such objection need not be made at the time thereby affording an opportunity either for offending counsel to withdraw the remarks or the trial court to instruct the jury not to consider them when they are of such nature that withdrawal or instruction would not render their harmful effect free from doubt. The reason for this rule is that counsel making the argument is the offender so the law will not require opposing counsel to take a chance on prejudicing his cause with the jury by making the objection. Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946." Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302, 304.

The jury in its answers to special issues Nos. 16 and 19 absolved appellee Ray of negligence, and by special issue No. 22 finding was made that the collision was not the result of an unavoidable accident.

The appellant complains in its fifteenth point of the misconduct of the jury.

From the evidence on the motion for new trial one of the jurors, Mr. Taylor, told the jury, that "it was an extra hazardous crossing; that he had seen it; that it was extra dangerous and a bad crossing when lights was lit up on both sides of the track."

In his findings of fact the trial court found that two or more of the jurors stated to other jurors that they had crossed over the railroad crossing, and thought it was dangerous; that there were no lights or anything there to show that it was a crossing; and that juror Taylor stated to other jurors that he had crossed the crossing a number of times before the signal light was put up there and it was a dangerous crossing; that he had used the crossing for a number of years, and that it was a bad crossing at night when the lights were lit up. The court concluded that the facts did not show that injury probably resulted to defendant.

The statements of the jurors and in particular Mr. Taylor had the effect of presenting for consideration facts from a member of the jury, and constituted additional evidence bearing upon a material issue, and given at a time when the de-

944

fendant had no opportunity to object to it, and no opportunity to cross-examine the party or parties making the statements, and as such is condemned by our courts, and we believe resulted in jury misconduct. Texas & P. Ry. Co. v. Gillette, 125 Tex. 563, 83 S.W.2d 307; City of San Antonio v. McKenzie Const. Co., 136 Tex. 315, 150 S.W.2d 989; Motley v. Mielsch, 145 Tex. 557, 200 S.W.2d 622.

In Figula v. Ft. Worth & D. C. Ry. Co., Tex.Civ.App., 131 S.W.2d 998, 999, we have the following statement:

"The last assignment of error contends that there is error in that some of the jurors discussed their knowledge of and experiences with the crossing in question.

"This argument—these statements—were made in arguing that a person should be able to see and hear an approaching train, at that crossing, in time to prevent a collision."

 By its sixteenth point the appellant assigns error by the court in allowing the clerk to omit the name of one of the jurors from the jury chosen: "After both jury lists had been handed to the Clerk the plaintiff discovered that he had not stricken the name of T. B. Aiken. He had made certain marks upon his list and upon his statement to the court that he had intended to scratch Aiken's name the court permitted the name to be omitted from the list of jurors chosen."

We do not believe this was error, but in accordance with Rule 234 the lists should have been gone over and jurors challenged and the names erased, so that the Clerk could have called the first twelve names on the list unchallenged. This is a matter that will doubtless not occur again.

We believe that it was error for the court to permit the plaintiff to attack the credibility of his own witness. This is presented by appellant under its eighteenth point.

The witness testified that he did not think the train was backing up, but that it was headed north, then inquiry was made concerning a written statement.

Objection was made that there was an effort to impeach the witness; further questions were directed concerning the giving and signing of a statement, and after further objections the statement was withdrawn, with the remark: "If he objects to it we will withdraw it, it is not important anyhow." Morgan v. Stringer, 120 Tex. 220, 36 S.W.2d 468; Ragsdale v. Ragsdale, 142 Tex. 476, 179 S.W.2d 291; Price v. Pelton, Tex.Civ.App., 199 S.W.2d 249.

In view of our disposition of this case we omit any discussion of the nineteenth point concerning the excessiveness of the verdict.

For the reasons stated the judgment of the trial court is reversed and the cause remanded for another trial.